## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |
|---|---|
| KRISTINA KING and KEN KING, | ) |
| Plaintiffs, | ) |
| v. | ) |
| BNC FOOD GROUP, LLC. and | ) |
| LONG JOHN SILVER'S, LLC. | ) |
| Defendants. | ) |

CIVIL ACTION NO.

**1:19-cv-00341**

## COMPLAINT

## INTRODUCTION

Plaintiffs, Kristina King and Ken King (hereinafter "the Kings"), bring this Title III, Americans with Disabilities Act action, pursuant to 42 U.S.C. §12181, et seq., (the "ADA") and its implementing regulations; the Texas Human Resource Code, Tex. Hum. Res. Code Ann § 121.001 et seq. (the "THRC"); and the Texas Architectural Barrier Act, Tex. Gov't Code Ch. 469 (previously Texas Revised Civil Statutes, Article 9102 et seq.) (the "TABA").

In Count One of the Complaint, the Plaintiffs seek to enjoin the Defendants to remove architectural barriers. The Plaintiffs also seek statutory damages as permitted by Texas law, as noted below, as the restaurant does not meet the express requirements of the ADA, THRC and TABA. In Count Two, the Plaintiffs seek to enjoin the Defendants to maintain practices, policies, and procedures necessary to

maintain the premises free of architectural barriers both now and once the barriers are removed. In Count Three, the Plaintiffs seek to enjoin the Defendants use of the premises to provide full and equal enjoyment of the premises to the disabled. Counts Two and Three seek independent relief in addition to the removal of architectural barriers. Count Four seeks to enjoin the Defendants' failure to design and construct the facility for readily accessibility and usability by individuals with disabilities. In Count Five of the Complaint, the Plaintiffs seek to enjoin the Defendants to remediate their website which fails to integrate an accessible platform usable by disabled individuals. In Count Six of the Complaint, the Plaintiffs seek to enjoin the Defendants' failure to take necessary steps to ensure the Plaintiffs are not denied services, segregated, or otherwise treated differently than individuals who do not have disabilities via the services offered on www.ljsilvers.com

## JURISDICTION, PARTIES, AND ARTICLE III STANDING

1. Because this is an action for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. §12181, et seq. and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §1331 and §1343.

2. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

**3.** Venue is proper in this Court, the United States District Court for the Western District of Texas, pursuant to Title 28, U.S.C. §1391 and the Local Rules of the United States District Court for the Western District of Texas.

**4.** Plaintiff, Kristina King is paraplegic. Specifically, Mrs. King suffered a spinal cord injury and is permanently confined to a wheelchair that limits her ability to perform manual tasks, walk, stand, lift, bend, and grab, all of which are major life activities pursuant to 42 U.S.C. §12102 (2)(A).  As result of Mrs. King's disability, she requires the use of mobility aids and assistive technology. Because she suffers a physical impairment substantially limiting one or more major life activities, Mrs. King is disabled pursuant to the ADA. 42 U.S.C. § 12102; *see also* 28 C.F.R. § 36.104.

**5.** Plaintiff, Ken King, is married to Kristina King and is not disabled. However, as result of association with a disabled individual, Mr. King suffered associational discrimination under the ADA pursuant to 42 U.S.C §12182(b)(1)(E); 28 C.F.R. §36.205. "In order to have Article III and statutory standing to bring an associational discrimination claim under the ADA, 'a plaintiff must allege some 'specific, direct and separate injury' as a result of association with a disabled individual." *Nevarez v. Forty Niners Football Company, LLC.,* No. 16-CV-07013-LHK, 2017 WL 3288634, at *5 (N.D. Cal. Aug. 1, 2017).

**6.** Mr. King suffered a direct and separate injury because he assisted and

accompanied Mrs. King on all her visits to the restaurant. It was his *own* desire to visit the restaurant with Mrs. King, but he suffered injuries in doing so because the Defendants denied Mrs. King full and equal accessibility. Mr. King experienced frustration, emotional distress, physical exhaustion and discrimination as result of being forced to assist his disabled wife to traverse and overcome numerous access barriers at the restaurant.

7. Defendant, BNC Food Group, LLC., (hereinafter and commonly known as "Long John Silver's"), is a limited liability corporation that is both registered to conduct business and is conducting business within the State of Texas sufficient to create both general and specific *in personam* jurisdiction. Upon information and belief, BNC Food Group "operates" and "leases" the Long John Silver's located at 5600 Cameron Rd, Austin, TX 78723. The restaurant is a commercial facility intended for nonresidential use and affects commerce. 42 U.S.C. § 12181(2)(A). Moreover, Long John Silver's offers "great-tasting fish, chicken, shrimp and more" and they "strive for better restaurant and guest experiences, fun and innovative new meal and, of course, great value", which qualifies BNC, commonly known as Long John Silver's, as a place of public accommodation pursuant to 42 U.S.C. § 12181(7) and is a public facility pursuant to Tex. Hum. Res. Code Ann. § 121.002(5).

8. Defendant, Long John Silver's, LLC. (hereinafter "LJS"), is a parent corporation

that is both registered to conduct business and is conducting business within the State of Texas sufficient to create both general and *in personam* jurisdiction. Upon information and belief, Long John Silver's, LLC. "owns" the public internet website www.ljsilvers.com and the goods and services offered on the world-wide website services that are available to the public at Long John Silver's. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services. 42 U.S.C. § 12182. Consistent with the text and legislative history of the ADA, the Department of Justice (hereinafter "Department") has long affirmed the application of Title III of the ADA to websites of public accommodations. Legislative history also supports that websites of public accommodations are covered under Title III.  Congress' purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), having found that "discrimination against individuals with disabilities persists in such critical areas as . . . public accommodations . . ." and that "many people with physical or mental disabilities have been precluded from [fully participating in all aspects of society]." 42 U.S.C. § 12101(a)(3) and (1).  Although the internet did not exist when Congress enacted the ADA in 1990, Congress intended to include the use

of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations. Consequently, it is consistent with Congressional intent to include within Title III's coverage the goods and services provided by public accommodations over their websites. *See Nat'l Fed'n of the Blind v. Scribd*, 97 F.Supp. 3d 565, 574 (D. Vt. 2015).

9. All events giving rise to this lawsuit occurred in the Western District of Texas and the Defendants are citizens thereof.

10. The Plaintiffs, the Kings, have resided in the Austin area for over 10 years and live 21 miles from the Defendant's establishment. The Kings shop, eat, and enjoy a variety of entertainment near where BNC is located. In fact, the Kings regularly visit the area where Long John Silver's is located to shop or browse other shops, dining and entertainment. The Kings intend to continue visiting Long John Silver' because of the "great-tasting fish, chicken, shrimp and more," guest experiences, fun and innovative new meal and the great value.

11. The Kings will return not only to dine at Long John Silver's, but to confirm ADA compliance by Long John Silver's. The Kings do not know exactly when they will return to Long John Silver's because they have not planned out every shopping trip for the rest of their lives. Such specific planning is not necessary to invoke the ADA. See, e.g. *Parr v. L & L Drive Inn Restaurant*, 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and *Segal v. Rickey's Restaurant and Lounge, Inc.*

No. 11-61766-cn, (S.D. Fla 2012) ("*Specification as to date and time of return to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment.*"). The Kings certainly intend to return to Long John Silver's, even after all ADA Title III violations are remediated.

12. Because of the barriers described below and throughout the Complaint, the Kings have been denied full and equal enjoyment of the Defendants' premises based on Mrs. King's disabilities.

13. Accordingly, Plaintiff, Mrs. King, has Article III standing to pursue this case because (1) she is disabled, pursuant to the statutory and regulatory definition; (2) the Defendant's restaurant is a place of public accommodation, pursuant to the statutory and regulatory definition; (3) she has suffered a concrete and particularized injury by being denied access to the restaurant by architectural barriers, by being denied access by the Defendants' practices described throughout this Complaint, and by being denied full and equal enjoyment of the use of the restaurant as the able-bodied, as described throughout the Complaint, and (4) because of these injuries there exists a genuine threat of imminent future injury, as described below.

14. Plaintiff, Mr. King, has Article III standing to pursue this case under associational discrimination pursuant to 42 U.S.C §12182(b)(1)(E); 28 C.F.R. §36.205,

because (1) he has association to a disabled individual as Mrs. King's husband; (2) the Defendants' restaurant is a place of public accommodation pursuant to the statutory and regulatory definition; (3) he has suffered a separate concrete and particularized injury because he experienced frustration, emotional distress, physical exhaustion, and discrimination as further described in Paragraph 6 and (4) because of these injuries there exists a genuine threat of imminent future injury, as described below.

## PLAINTIFFS' CLAIMS

### Title III of the American with Disabilities Act

15. On or about July 26, 1990, Congress enacted Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181 et. seq. Commercial enterprises were provided one and a half years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. (42 U.S.C. §12181; 20 C.F.R. §36.508 (A); *See also*, § 36.304).

16. Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it provides dining among other services to the public. Accordingly, it is covered by the ADA and must comply with the Act.

## The Texas Architectural Barrier Act and The Texas Accessibility Standards

17. Texas passed the Texas Architectural Barrier Act in an effort "to further the policy of this state to encourage and promote the rehabilitation of persons with disabilities and to eliminate, to the extent possible, unnecessary barriers encountered by persons with disabilities whose ability to…achieve maximum personal independence is needlessly restricted." Tex. Gov't Code, Sec. 469.001.

18. Under the TABA, the Texas Commission of Licensing and Regulation (the "Commission") was charged with the task of adopting "standards, specifications, and other rules…that are consistent with standards, specifications, and other rules adopted under federal law." Tex. Gov't Code, Sec. 469.052.

19. The Texas Accessibility Standards (the "TAS"), adopted under the TABA, apply to, inter alia, "a privately funded building or facility that is defined as a 'public accommodation' by Section 301, Americans with Disabilities Act of 1990 (42 U.S.C. Section 12181), and its subsequent amendments…" Tex. Gov't Code, Sec. 469.003(4).

20. The TAS received equivalency certification from the United States Department of Justice on September 23, 1996, including the appendix and

Architectural Barriers Administrative Rules Chapter 6, which met or exceeded the new construction and alteration requirements of Title III of the ADA. "This means that such buildings must comply with the Texas Accessibility Standards of the Architectural Barriers Act ("TAS"), which is similar to the ADA's Accessibility Guidelines." *Burrell v. Akinola*, No. 3:15-CV-3568-B, 2016 WL 3523781, (N.D. Tex. Jun. 27, 2016) (citing Tex. Hum. Res. Code Ann. § 121.003(d)(1) and Tex. Gov't Code Ann. § 469.003(a)(4)).

**COUNT ONE**
**VIOLATION OF THE ADA, TITLE III**
**42 U.S.C. § 12182(b)(2)(A)(iv); the TABA and the TAS**
**Tex. Hum. Res. Code Ann. § 121.001 et seq.; Tex. Gov't Code, Sec. 469.001**
***(Architectural Barriers)***

**Defendant's Facility Is Subject to the 2010 ADA Design Standards and 2012 TAS for the Portions of the Facility Addressed in This Complaint**

21. The Plaintiffs are informed and believe based on publicly available information that the establishment in which BNC is located at 5600 Cameron Rd, Austin, TX 78723, was constructed in 2004.

22. Compliance with the 2012 TAS for new construction and alterations of all buildings and facilities subject to Texas Government Code Chapter 469.003.

23. The ADA was enacted requiring that facilities constructed prior to January 26, 1992, are considered an "existing" "facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All "alterations" made to existing facilities after

January 26, 1992, and all "new construction" after January 26, 1993, must be *readily accessible to and usable by individuals with disabilities*, including *individuals who use wheelchairs*. 42 U.S.C. § 12183(a) and (b). 28 *C.F.R.* § 36.402. "Readily accessible to and usable by. . ." is the "new construction" standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28  *C.F.R.* § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the "new construction" standards is if the design and construction of the building to be readily accessible and usable is "structurally impracticable". 42 U.S.C. § 12183(a)(1). The "structural impracticability" defense applies only in rare circumstances of extraordinary terrain. 28 *C.F.R.* § 36.401(c). "Readily accessible to and usable by. . ." is also the "alterations" standard. 42 U.S.C. § 12183(a)(2). "Alterations" must be made to the maximum extent feasible.  42 U.S.C.  § 12183(a)(2); 28 *C.F.R.* § 36.402. An alteration is a change to a place of public accommodation or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 *C.F.R.* § 36.402(b).

24. New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design. 28 *C.F.R.* § 36.406 establishes whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply: New

construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 *C.F.R.* § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010, and before March 15, 2012. 28 *C.F.R.* § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. *Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable*. See 28 C.F.R. § 36.406(5)(ii) which states, "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or

altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."

25. For the architectural barriers at issue in this case, the TAS and 2010 Standards for Accessible Design are applicable.

## **Plaintiffs' Concrete and Particularized Standing to Pursue an Injunction**

26. The Defendants have discriminated, and continue to discriminate, against the Plaintiffs, and others who are similarly situated, by denying full and equal access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations at Long John Silver's in derogation of 42 U.S.C. § 12101 et. seq., and as prohibited by 42 U.S.C. § 12182 et-seq. As "new construction", the building must be readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183 (a) and (b). The Defendants' failure to remove the existing barriers thus violates 42 U.S.C. § 12182(b)(2)(A)(iv), which requires removal of architectural barriers.

27. The Defendants have also has discriminated, and continues to discriminate against the Plaintiff, Mr. King, by denying equal goods, services, facilities, privileges, advantages, accommodations, and/or other opportunities at Long John Silver's based on the known disability of an individual with whom Mr. King is known to have a relationship and association. Mr. King assisted and accompanied

Mrs. King on all her visits to Long John Silver's and it was his own desire to visit the restaurant with Mrs. King, but he suffered injuries in doing so because the Defendants denied Mrs. King full and equal accessibility. Mr. King experienced frustration, emotional distress, physical exhaustion and discrimination as described in Paragraph 6.

28. As described above, prior to the filing of this lawsuit, Plaintiffs were denied full and safe access to all the benefits, accommodations and services offered to individuals without disabilities within and about the Defendants' facility. The Plaintiffs' access was inhibited by each of the described architectural barriers detailed in this Complaint which remain at the facility in violation of the ADA. Because of the foregoing, the Plaintiffs have suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against.

29. The Plaintiffs have definite plans to return to Long John Silver's in the future, as described in paragraphs 10. The Plaintiffs will return to Long John Silver's not only to not only to dine, but also to see if Long John Silver's has repaired the barriers and changed its practices and procedures. The Plaintiffs will continue dining at Long John Silver's since it is near other shops, eats and entertainments, as they have in the past and in the near future, and even when Long John Silver's is repaired, because Long John Silver's is a great place to enjoy "great-tasting fish, chicken, shrimp and more" and they "strive for better restaurant and guest

experiences, fun and innovative new meal and, of course, great value." Also, of vital importance, the barriers are not just created by construction issues; instead, many of them come from human activity from the way the management and the workers at Long John Silver's use its physical facilities. The barriers created by human activity will need to be reviewed forever to be sure the Defendants' management and workers continuously act in a manner that does not create barriers. Absent remedial action by the Defendants, the Plaintiffs will continue to encounter the architectural barriers, and the discriminatory policies, practices, and procedures described herein and as a result, be discriminated against by the Defendants based on their disabilities. The Eleventh Circuit, held in *Houston v. Marod Supermarkets*, 733 F.3d 1323 (11th Cir. 2013), that when architectural barriers have not been remedied "*there is a 100% likelihood that plaintiff … will suffer the alleged injury again when he returns to the store*." Additionally, *"[A]n alleged constitutional infringement will often alone constitute irreparable harm." United States v. Arizona*, 2011 WL Case 1:11-cv-01804-TWT at \*19; see also *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (*finding "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."*)). Due to the certainty of the Plaintiffs' plans to continue visiting the subject facility together, their past patronage, and their

travel near the Defendants' establishment, there exists a genuine threat of imminent future injury, *Houston v. Marod, supra*.

## <u>ARCHITECTURAL BARRIERS</u>

30. Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 28 C.F.R. Part 36.

31. "The discrimination prohibited by [the THRC] includes…a failure to…comply with Article 9102, Revised Statutes." Tex. Hum. Res. Code Ann. § 121.003(d)(1). Thus, a violation of the Texas Architectural Barriers Act (TABA) – and the 2012 TAS requirements adopted under the TABA – is a violation of the Tex. Hum. Res. Code § 121.003(d)(1).

32. The Plaintiffs have been throughout the establishment from the parking lot to the entrance, from the entrance to and throughout the dining areas, from the dining areas to and throughout the restrooms, the restrooms themselves; throughout circulation paths and accessible routes, and throughout the common areas including paths of travel, and in particular but not limited to all of which is more specifically described below. The Defendants' establishment located at 5600 Cameron Rd, Austin, TX 78723 more commonly known as "Long John Silver's", violates the ADA particular to but not limited to:

**A.** The Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at the Defendants' place of public accommodation which includes but is not limited to the following failures of the Defendants:

**(1)** The Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to parking spaces failing to be located on the accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

**(2)** The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the level parking spaces measure 96 inches wide minimum with adjoining compliant access aisles that measure 60 inches wide minimum and connect to an

accessible route to the entrance of the establishment;

(3) The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

(4) The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

(5) The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces maintain a ground surface that is level;

(6) The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor

or ground surface measured to the bottom of the sign;

**(7)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**B.** The Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible van parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at the Defendants' place of public accommodation which includes but is not limited to the following failures of the Defendants:

**(1)** The Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to van

parking spaces failing to be located on the accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

(2) The parking area fails to maintain the required amount of accessible van accessible parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking space measures 132 inches wide minimum with an adjoining compliant access aisle that measures 60 inches wide minimum, or alternatively a 96 inch wide space with an adjoining 96 inch wide access aisle, and connects to an adjoining accessible route to the entrance of the establishment;

(3) The parking area fails to maintain the required amount of accessible van parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking spaces adjacent access aisle extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

(4) The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that

the parking spaces adjacent access aisles do not overlap the vehicular way;

(5) The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces maintain a ground surface that is level;

(6) The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with van-accessible signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

(7) The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**C.** The entrance floor mats are not stable, firm, or otherwise secured to the floor;

**D.** The Defendants maintain a sales/service counter for able-bodied individuals to transact business and other services, but fails to provide an ADA accessible checkout counter for disabled individuals in all the ways that are required to be readily accessible to and equally usable by individuals with disabilities, which includes but it not limited to the following failures of the Defendants:

**(1)** There is not at least one sales/service counter that is maintained in a readily available and usable condition with a minimum of 36 inches of clear counter surface for individuals with disabilities to be able to make a parallel approach to the counter;

   **a.** There is not 36 inches of clear counter surface measured a maximum of 36 inches above the finished floor that is maintained in a readily accessible and usable condition to the disabled;

   **b.** The Defendants fail to maintain the required clear floor space at the counter so that the floor space is at least 48 inches long x 30 inches wide and maintained adjacent to the 36-inch minimum length of counter that is otherwise readily accessible to and usable by individuals with disabilities;

**(2)** There is not at least one counter that is maintained in a readily accessible and available condition that provides a minimum of 30 inches of clear counter surface for individuals with disabilities to use a forward approach to the counter;

**(3)** There is not at least one sales/service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled.

**E.** The Defendants provide a self-servicing beverage counter for able-bodied individuals to serve themselves drinks but fails to provide an ADA accessible self-servicing beverage counter for disabled individuals in all the ways that are required to be readily accessible to and equally usable by individuals with disabilities, which includes but it not limited to the following failures of the Defendants:

**(1)** There is not at least one of each type of self-servicing beverage counter that is maintained in conformance with the ADA Standards for

Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals.

(2) There is not at least one of each type of self-servicing beverage counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface.

(3) The Defendants fail to maintain the required clear floor space at the counter so that the floor space is at least 48 inches long x 30 inches wide and maintained adjacent to the 36-inch minimum length of counter that is otherwise readily accessible to and usable by individuals with disabilities.

(4) There is not at least one of each type of self-servicing beverage counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of

counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter.

(5) There is not at least one of each type of self-servicing beverage counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled.

(6)  There is not at least one of each type of self-servicing beverage counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter.

(7) The napkins, lids, and other items on the counter are arranged so that individuals with disabilities cannot fully an independently access the items.

(8)  Defendants segregate individuals with disabilities to an inferior benefit because disabled individuals require assistance to retrieve items maintained on the counter.

(9) The self-servicing beverage counter floor mat fails to be maintained in conformance with the ADA Standards for Accessible Design so that the mat is stable, firm, or otherwise secured to the floor.

(10) The Defendants fail to maintain the accessible features of the self-servicing beverage counter that are required to be readily accessible to and usable by individuals with disabilities.

F. The Defendants provide several types of dining surfaces disbursed throughout the establishment for the consumption of food or drink for able-bodied individuals, but fails to maintain that same level of service to individuals without disabilities, which segregates and relegates individuals with the disabilities to inferior benefits of the goods and services provided at the Defendants' place of public accommodation which includes but is not limited to the following failures of the Defendants:

(1) There is not at least 5% of the seating spaces and standing spaces at area dining surfaces that are maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes

but is not limited to the accessible route to the dining surfaces which has the discriminatory effects of rendering the seating spaces and its associated elements as unusable by disabled individuals;

**(2)** There is not at least 5% of the seating spaces and standing spaces at dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required t-shaped and/or circular turning clear floor space;

**(3)** There is not at least 5% of the seating spaces and standing spaces at dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required 30x48 inches of clear floor space that is positioned for a forward approach to the dining surfaces;

**(4)** There is not at least 5% of the seating spaces and standing spaces at dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the tops of the dining surfaces measure 28 inches minimum and 34 inches maximum above the finished which includes the required 30 inches of clear dining surface so that the surface does not prohibit disabled individuals from being equally afforded the opportunity to sit and enjoy the goods and services at the establishment;

**G.** The Defendants provide a restroom for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of the Defendants':

**(1)** When entering and/or exiting the restroom there is insufficient maneuvering clear floor space for individuals who require mobility devices to approach the door to pull it open and/or maneuver into the restroom.

**(2)** The Defendants maintain items in the maneuvering clearance at the restroom door which has the discriminatory effect in practice of prohibiting disabled individuals from the full and equal opportunity to maneuver independently throughout the restroom.

**(3)** There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements

which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled.

**(4)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled.

**(5)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the center line of the water closet located 16-18 inches from the side wall with the top of the water closet seat surface 17-19 inches above the finished floor and otherwise readily accessible to and usable by disabled individuals.

**(6)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the water closets flush control valve mains operable compliant hardware or otherwise located on the

openside of the water closet.

**(7)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the required maneuvering clearance maintained around the water closet so that the maneuvering clear floor space around the water closet is not obstructed and consequently rendering the compartment as unusable by the disabled.

**(8)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 42 inch long grab bar that is located a maximum of 12 inches from the rear wall and extending a maximum distance of 54 inches from the rear wall, with the top gripping surface of the grab 33-36 inches above the finished floor.

**(9)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA

Standards for Accessible Design so that the toilet paper dispenser and its operable parts comply with the applicable standards for accessible design and does not obstruct the gripping surface above and/or below the grab bar.

(10) The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the water closet and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor.

(11) The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispenser's operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet.

(12) The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition or otherwise configured in away by

conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled.

(13) The Defendants fail to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities.

H. The Defendants provide a lavatory in the restroom for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of the Defendants:

(1) The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled.

(2) There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink

measures a maximum of 34 inches above the finished floor and positioned for a forward approach.

(3) The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals

(4) There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the water supply and drain pipes under the sink is insulated or otherwise configured to protect against contact.

(5) There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor.

(6) The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper.

(7) The soap dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or obstructed reach ranges and do not require the use

of two hand operation, tight grasping, twisting, and/or pinching of the wrist.

**(8)** The Defendants fail to maintain the accessible features of the lavatory that are required to be readily accessible to and usable by individuals with disabilities.

**COUNT TWO**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(b)(2)(A)(ii)**
*(Practices, procedures, and policies denying equal benefits)*

## ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers

33. The Plaintiffs incorporate by reference and reallege all the paragraphs above.

34. The ADA, Title III, provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added).

35. The ADA, Title III, specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A)(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). In other words, the disabled must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with

disabilities in "the most integrated setting appropriate." 42 U.S.C. §
12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to
recognizing that persons who use wheelchairs and mobility aids have been
forced to sit apart from family and friends, also recognizes that persons who
use wheelchairs and mobility aids historically have been provided "segregated
accommodations" compared to non-disabled individuals, thus relegating
persons who use wheelchairs "to the status of second-class citizens." See 28
C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308,
36.203).

36.   Congress enacted the ADA in light of its findings that "individuals with
disabilities continually encounter various forms of discrimination, including
outright intentional exclusion, the discriminatory effects of architectural,
transportation, and communication barriers, overprotective rules and policies,
failure to make modifications to existing facilities and practices, exclusionary
qualification standards and criteria, segregation, and relegation to lesser
services, programs, activities, benefits, jobs, or other opportunities."   42
U.S.C. § 12101(a)(5).

37.   To address this broad range of discrimination in the context of public
accommodations, Congress enacted ADA, Title III, which provides in part:
"No individual shall be discriminated against on the basis of disability in the

full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

38. By its clear text, ADA, Title III requires a public accommodation to provide individuals with disabilities *more than simple physical access.* Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with ADA, Title III. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

39. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or

procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in *Rendon v. Valleycrest Prod., Ltd.* 294 F.3d 1279, (11th Cir. 2002) that:

> "*A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both <u>tangible barriers</u> (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and <u>intangible barriers</u> (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendants entity's goods, services and privileges.*"

## Defendants' Failed Practices and Lack of Policies Are Discriminatory

40. Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii) discrimination includes:

> "*a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the*

> *nature of such goods, services, facilities, privileges, advantages, or accommodations*."

41. Accordingly, a place of public accommodation must modify a policy or practice that has the consequence of, or tends to deny, access to goods or services to the disabled. Similarly, a place of public accommodation must not have a policy or practice that "*has a discriminatory effect in practice*" of preventing disabled individuals from realizing the full and equal enjoyment of the goods and services the public accommodation offers to potential customers. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F.Supp.3d 565 (D. Vt. 2015).

42. As detailed below, the Defendants failed to make reasonable modifications in their policies, practices, and procedures that are necessary to afford its goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, the Defendants denied services, segregated or otherwise treated Plaintiff differently than other individuals who are not disabled. Pursuant to 42 U.S.C. § 12182(b)(2)(A), the Defendants have discriminated against the Plaintiffs. The Defendants will continue that discrimination forever until enjoined as the Plaintiffs request. The discrimination is described more particularly in the following paragraphs.

43. The Defendants either have no policies, practices, and procedures to remove

architectural barriers or else do not abide by them. The rampant architectural barriers previously identified in Count One establish that the Defendants have failed to create, adopt, and/or implement ADA Title III compliance policies, procedures, and practices as to architectural barriers.

44. The Defendants' use of their establishment, and their practices at Long John Silver's located at 5600 Cameron Rd, Austin, TX 78723 creates barriers and, thus denies the Plaintiffs the full and equal enjoyment of the establishment. Those practices include:

   (a) The Defendants fail to provide ADA accessible parking with connecting accessible routes to the establishment from its parking area, which means that the Plaintiffs are forced to depend on assistance from a third party to get into Long John Silver's, whereas the non-disabled can conveniently access the establishment from the parking area;

   (b) The Defendants make the sales/service counters inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means the Plaintiffs cannot fully and equally use the counter and check out as the non-disabled, because the non-disabled have a sales/counter to purchase and checkout food;

   (c) The Defendants provide a self-service beverage machine inaccessible for use by the disabled by failing to provide the required accessible reach range

and operation mechanism so that the disabled can independently access the beverage machine, which means the Plaintiffs cannot fully and equally use the self-service beverage machines to select a drink of their choice in the same way as the non-disabled, because the non-disabled have self-service beverage machines they can use independently;

**(d)** The Defendants' seating arrangement is designed, positioned, and oriented in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike the able-bodied, disabled individuals are forced to sit at one type of table or facing the wall, or are outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Long John Silver's experience;

**(e)** The Defendants' use of the seating arrangement has a discriminatory effect in practice, so that the Plaintiffs are provided a "separate" and "unequal" benefit than that of able-bodied individuals because able-bodied individuals can sit at every type of seating table, whereas the Plaintiffs are entirely prohibited from that same "opportunity" to considering where they want to sit;

**(f)** The Defendants make their restroom and lavatory inaccessible for use by the disabled by failing to maintain any ADA accessible elements within the

restrooms so that the Plaintiffs are afforded the opportunity to independently use the restroom, or clean up, or move into and throughout the restroom, whereas non-disabled individuals independently use the restrooms;

(g) The Defendants' policies, practices, and procedures are conducted without regard to disabled individuals;

45. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendants have no policies, practices, or procedures, or else they have failed to implement them, to ensure that any removal of architectural barriers is permanent. 42 U.S.C. § 12182(b)(2)(a)(iv) and (v).

46. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendants' existing practice is both in effect and/or explicitly to remediate ADA Title III architectural barriers only upon demand by the disabled.

47. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendants have no policies, practices, and procedures or else they failed to create, implement and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at Long John Silver's as individuals without disabilities, 42 U.S.C. 12182(b)(1)(A), and in particular the opportunity to have full and equal access to

all of the goods, services, privileges, advantages, or accommodations of Long John Silver's, as described above in detail.

48. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendants have failed to create, implement, and maintain a policy of complying with ADA building design standards and regulations.

49. To date, the Defendants' discriminating policies, practices, and/or procedures have not been reasonably modified to afford goods, services, facilities, privileges, advantages, or other accommodations to individuals with disabilities.

50. A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, and accommodations. The Plaintiffs hereby demand that the Defendants both create and adopt a corporate practice and policy that the Defendants (1) will fully comply with Title III, ADA, and all its implementing regulations so that architectural barriers identified above are permanently removed from the Defendants' establishment consistent with the ADA; (2) the Defendants will provide the disabled, including those with mobility limitations full and equal use and enjoyment of Long John Silver's; (3) the Defendants will modify their practice of making ADA Title III architectural barrier remediation's only upon demand by the disabled.

51. The ADA is over twenty-five (25) years old. Defendants know they must comply with the ADA Title III. The ADA Title III requires modifications in policies, practices, and procedures to comply with it, as pled above in the statute. 42 U.S.C. §12182(b)(2)(A)(ii).

52. By this Complaint, the Plaintiffs provide sufficient notice of their demand for an alteration in the Defendants' policies, practices, and procedures.

53. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

54. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal policies, practices, and procedures.

## COUNT THREE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### *Denial of Full and Equal Enjoyment*

55. The Plaintiffs incorporate by reference and reallege all the paragraphs above.

56. 42 U.S.C. § 12182(a) provides:

> *"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."*

**57.** 42 U.S.C. § 12182(b)(1)(E) provides:

> "*It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.*"

**58.** Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

**59.** Congress also found that: "*individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities,* 42 U.S.C. § 12101(a)(5); "*the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;*" 42 U.S.C. § 12101(a)(7). Congress even found that: "*the*

*continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."* 42 U.S.C. § 12101(a)(8).

60. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

61. The ADA provides, inter alia, that it is discriminatory to subject an individual or class of individuals based on a disability "to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

62. The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability ... with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

**63.** Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). Defendants' acts and omissions alleged herein are in violation of the ADA, 42 U.S.C. §§ 12101, et seq., and the regulations promulgated thereunder.

**64.** To address this broad range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination"* including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3,

101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

65. For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' *full and equal enjoyment* of the privileges and *services* offered by the public accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(1)(A)(i).

66. The keystone for this analysis is Defendants *must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. Spector v. Norwegian Cruise Line Ltd.,* 545 U.S. 119, 128–29, 125 S. Ct. 2169, 162 L.Ed.2d 97 (2005) See also, *Baughman v. Walt Disney World Company*, 685 F.3D 1131, 1135 (9th Cir. 2012).

67. The Plaintiffs were denied full and equal access to Long John Silver's. The Plaintiffs specifically and with certain wants to return to the Defendants' establishment to enjoy the "great-tasting fish, chicken, shrimp and more," guest experiences, fun and innovative new meal and the great value. More specifically,

the Plaintiffs want to be afforded the same level of service that is offered to non-disabled individuals and which the Defendants have failed to provide to the Plaintiffs as follows: the Defendants failed to provide the Plaintiffs the same opportunity to independently participate in and enjoy the ""great-tasting fish, chicken, shrimp and more," guest experiences, fun and innovative new meal and the great value; the Defendants failed to provide accessible parking and accessible routes into Long John Silver's for disabled individuals, which means the Plaintiffs cannot park, cannot independently get out of their cars and onto their wheelchairs, cannot independently travel from the parking area into Long John Silver's, cannot determine if there is a usable parking space, and must determine by trial and error how they are to park and move into Long John Silver's; the Defendants failed to provide the Plaintiffs the same experience as the non-disabled by use of its seating arrangements throughout the establishment that are designed, positioned and orientated in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike able bodied individuals, disabled individuals are forced to sit at one type of table or facing the wall, or otherwise outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Long John Silver's experience; the Defendants failed to provide the same experience by making it

nearly impossible for the disabled to access the sales/service counters, while the non-disabled can independently access the counter and services provided at the counter; the Defendants failed to provide an accessible restroom for the disabled individuals, which means that, unlike the able-bodied, the disabled are challenged or denied the opportunity to independently use the restrooms, clean up after using the restrooms, move throughout the restrooms, and use the other elements of the restrooms; the Defendants failed to provide the Plaintiffs that same experience that non-disabled individuals have when sitting and enjoying their food and drinks at Long John Silver's by failing to provide access to the dining tables and seating; the Defendants failed to provide the Plaintiffs the same experience by failing to provide a description of the accessible features of Long John Silver's on their website, which means the Plaintiffs cannot fully and equally evaluate the features of Long John Silver's to determine what features, if any, are accessible to and usable by disabled individuals, while the non-disabled are able to independently use the website to evaluate all of the non-accessible features of Long John Silver's provided to them; the Defendants failed to provide the Plaintiffs the same experience by failing to provide a mobile application service that allows the disabled to view all of the accessibility features at Long John Silver's to determine what features, if any, are accessible to and usable by disabled individuals, while the non-disabled are able to independently use the

mobile application to view and evaluate all of the non-accessible features of Long John Silver's provided to them; the Defendants failed to provide the Plaintiffs the same experience by failing to modify its website and mobile application services to allow assistive technology for the disabled, which includes but is not limited to voice recognition, alternative input methods, and assistive touch functions, among other accessibility methods that the Plaintiffs and other disabled individuals require in order to use mobile applications and their associated features in the same, equal way that non-disabled individuals are able to use them; the Defendants' continued failure to maintain ADA accessibility as an integral part of the Long John Silver's atmosphere and experience that non-disabled individuals get to independently enjoy has segregated or otherwise treated the Plaintiffs and others similarly situated differently, in that, Long John Silver's makes the Plaintiffs dependent on family or an independent third party which is not the same experience that Long John Silver's affords to non-disabled individuals; the Defendants denied the Plaintiffs the full and equal enjoyment of Long John Silver's; and all the foregoing failures by the Defendants inhibited the Plaintiffs from having the same experience that non-disabled individuals have when at the Long John Silver's establishment.

68. In its Preamble to the title III regulation, the Department of Justice recognized that mobility impaired persons including persons in wheelchairs should have the

same opportunities to enjoy the goods and services and other similar events of public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

69. The ADA specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A)) (ii)-(iii); 28 C.F.R. § 36.202(b)-(c). Further, 28 C.F.R. § 302(b) require that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided "inferior seating" and "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." See 28 C.F.R.  pt.  36, App.  B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

70. Thus, the Defendants' "use" of the accessible features constitutes statutory discrimination in violation of the ADA, because the Defendants have segregated

and separated the disabled from the non- disabled individuals. "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *H.R. Rep. No. 101-485(III), at 50, 1990 U.S.C.C.A.N at 473.* The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate those individuals into the economic and social mainstream American life. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct.1879, 149 L.Ed.2d 904 (2001) (*quoting H.R.Rep. No. 101-485, pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332*).

71. The Defendants discriminated against the Plaintiffs by denying the Plaintiffs "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the facility during each visit. Each incident of deterrence denied the Plaintiffs an equal "opportunity to participate in or benefit from the goods, services, facility, privilege, advantage, or accommodations" of Boomtown.

72. The Defendants' conduct and the Defendants' unequal treatment to Plaintiffs constitutes continuous violations of the ADA and absent a Court ordered injunction from doing so, the Defendants will continue to treat the Plaintiffs and others similarly situated unequally to the status of a second-class citizen.

73. The Defendants' failure to maintain the accessible features that are required to

be readily accessible to and usable by individuals with disabilities constitute continuous discrimination and absent a Court ordered injunction, the Defendants will continue to not maintain the required accessible features at the Defendants' facility. 28 C.F.R.§ 36.211(a).

74. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

75. Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal acts of the Defendants.

**COUNT FOUR**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12183(a)(1)**
*(Failure to design and construct facility for ADA compliance)*

76. Plaintiffs incorporate by reference and reallege all the paragraphs above.

77. 42 U.S.C. § 12183(a)(1) provides:

> *[Discrimination includes] a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.*

**78.** Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." Id. § 12101(a)(5). In its Preamble to the title III regulation, the Department of Justice recognized that persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of a public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

**79.** To eliminate such segregation Congress enacted the requirement that facilities be "readily accessible to and usable by individuals with disabilities". This very requirement is intended to enable persons with disabilities "*to get to, enter and use a facility.*" H.R. Rep. No. 101- 485(III), at 499-500 (1990). It requires "a high degree of convenient accessibility," id., as well as access to the same services that are provided to members of the general public. "For new construction and alterations, the purpose is *to ensure that the service offered to persons with*

*disabilities is equal to the service offered to others*." *Id*.

80. As the legislative history makes clear, the ADA is geared to the future-- the goal being that, over time, access will be the rule rather than the exception. Thus, the ADA only requires modest expenditures to provide access in existing facilities, *while requiring all new construction to be accessible.* H.R. Rep. 485, Part 3, 101st Cong., 2d Sess. 63 (1990).

81. To realize its goal of a fully accessible future, Congress required that all newly constructed facilities be designed and constructed according to architectural standards set by the Attorney General. 42 U.S.C. §§ 12183(a), 12186(b). Those Standards for Accessible Design ("Standards") are incorporated into the Department of Justice's regulation implementing title III of the ADA, 28 C.F.R. Part 36, Appendix A. The Standards set architectural requirements for newly constructed buildings that apply to all areas of the facility, from parking areas, interior walkways and entrances, common areas, interior stairways and elevators, restrooms, dressing rooms and sales/service areas.

82. The Defendant, Long John Silver's, LLC, "owns" the real property and its improvements in which BNC, commonly known as Long John Silver's, is located and is directly involved in the designing and/or construction of the restaurant in this litigation for first occupancy after January 1993.

83. The Defendant, BNC Food Group, LLC is the "operator of" Long John Silver's,

and at all relevant times was and is directly involved in the designing and/or construction of the applicable facilities in this litigation for first use after January 1993.

84. The Defendants were and are required to design and construct Long John Silvers to be "readily accessible to and usable by individuals with disabilities." the he Defendants violated the statute by failing to design and construct *its applicable facilities to be* readily accessible to and usable by individuals with disabilities including individuals who use wheelchairs. The Defendants further violated the statute by failing to design and construct their establishment in compliance with the ADA during planned alterations as described throughout this Complaint.

85. According to the Defendants' own publicly available information, the Defendants chose to design their facility in a way that is not ADA Title III compliant whatsoever. The Defendants literally strategically designs, constructs and maintains their facility without any regard to the disabled. The Defendants' systematic design of their applicable facility fails to afford disabled individuals the same experience that is afforded to individuals without disabilities.

86. To date, the Defendants' discriminating actions continue.

87. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C.

§ 12205.

88. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by the Defendants.

## COUNT FIVE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12182(a) and 28 C.F.R. § 36.302 (e)(1)(i)-(ii)
### *(Failure to Integrate Website Accessibility)*

89. The Plaintiffs incorporate by reference and reallege all the paragraphs above.

90. The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., *1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *Id. at 50, 1990 U.S.C.C.A.N. at 473.*

91. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services,

programs, activities, benefits, jobs, or other opportunities."   42 U.S.C. 12101(a)(5).

92. Legislative history indicates that websites of public accommodations are covered by Title III. Although the internet did not exist when Congress enacted the ADA in 1990, the legislative histories state that Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations.  Consequently, it is consistent with Congressional intent to include within Title III's coverage the goods and services provided by public accommodations through their websites. *See Nat'l Fed'n of the Blind v. Scribd*, 97 F. Supp. 3d 565, 574 (D. Vt. 2015).

93. The Justice Department has long affirmed the application of Title III to the websites of public accommodations. *The statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet."* 75 Fed Reg. 43,460, 46,463 See also *Netflix,* 869 F. Supp. 2d at 200 *(excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 20 (1st Cir. 1994).

94. Today, internet technology enables individuals to participate actively in their community and engage in virtually all forms of commerce from the comfort and convenience of their home, to the extent that virtual reality through the internet is almost as important as physical reality in brick-and-mortar constructed public accommodations, in pursuing commerce from public accommodations. That websites were not explicitly written into the ADA at its passage in the early 1990s but are nevertheless covered does not indicate ambiguity in the ADA, but rather the breadth of the ADA. *Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, (E.D.N.Y. Aug. 1, 2017).

95. The Defendants did not allow Plaintiffs to use the website in the same manner as individuals without disabilities, because the website fails to integrate alternative platforms that enable disabled individuals who have limited use of their hands the opportunity to use the alternative platforms to navigate and select items on the page. The able-bodied online website user can only use a mouse to navigate, whereas individuals who have limited use of their hands cannot use assistive technology to navigate through the website. Moreover, the Defendants provide a plethora of services and associated benefits, including but not limited to coupons, menu, restaurant locations, gift cards, among other services to able-bodied individuals, but fails to provide those same services to disabled individuals which relegates and otherwise segregates disabled individuals to inferior benefits and

services of Long John Silver's.

96. The design of the Defendants' web site impedes the Plaintiffs and others similarly situated from accessing the services, privileges and accommodations afforded able-bodied patrons through the web platform. The website fails to integrate alternative access methods that allow a person with limited manual dexterity to access the information and navigate the web site without being able to use a mouse. That is, the website design does not provide for functions to be carried out using a keyboard or voice input. On its website, the Defendants provide a plethora of services and associated benefits, including but not limited to coupons, menu, restaurant locations, gift cards, among other services to the general public, but fails to provide those same services to persons with disabilities. Such actions relegate and otherwise segregate persons with disabilities to inferior benefits and services offered by Long John Silver's.

97. As pled previously, intangible barriers to access are prohibited, just as tangible barriers are prohibited.

98. The actions by the Defendants violate:

    (a) 42 U.S.C. § 12182(a), because its actions deny the Plaintiffs full and equal enjoyment of the Defendants' goods and services;

    (b) 42 U.S.C. § 12182(b)(1)(A)(i), because the Defendants' actions deny the Plaintiffs equal participation in goods and services offered by the

Defendants;

   **(c)** 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because the Plaintiffs are provided both separate and unequal benefits of the Defendants' goods and services;

   **(d)** 42 U.S.C. § 12182(b)(1)(B), because the Defendants do not provide their goods and services in the most integrated setting appropriate;

   **(e)** 28 C.F.R. 36.303(c), because the Defendants have failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiffs.

99. The Plaintiffs do not allege that there are specific mandatory regulations for websites that establish compliance or non-compliance as a matter of law. Plaintiffs plead, consistent with the Department of Justice determinations, that in achieving such conformance and usability of websites by individuals with disabilities, the Defendants should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.1 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

**100.**  To date, the Defendants' discriminating actions continue.

**101.** As pled above, Long John Silver's LLC., is the "owner" of the public internet website www.ljsilvers.com and "operates" the world-wide websites services that are available to the public at Long John Silver's. Therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services, as alleged above. 42 U.S.C. § 12182.

**102.** The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

**103.** Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by the Defendants.

## COUNT SIX
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(2)(A)(iii)
### *(Failure to Provide Services Necessary to*
### *Ensure Equal Access to Innovative Technology)*

**104.** The Plaintiffs incorporate by reference and reallege all the paragraphs above.

**105.** The ADA was the most sweeping civil rights legislation since the Civil Rights Act of 1964. When it was enacted Congress had no conception of how the Internet would change global commerce. "[W]e were not communicating by e-mail, blog, or tweet; we were not filling virtual shopping carts with clothes,

books, music, and food; we weren't banking, renewing our driver's licenses, paying taxes or registering for and taking classes online. Congress could not have foreseen these advances in technology. Despite Congress' great cognitive powers, it could not have foreseen these advances in technology which are now an integral part of our daily lives. Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace." *Achieving the Promises of the Americans with Disabilities Act in the Digital Age—Current Issues, Challenges and Opportunities: Hearing before the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the House Comm. on the Judiciary,* 111th Cong., 2d Sess. 111–95 (2010).

106. Since the internet plays such a critical role in the personal and commercial lives of Americans, excluding disabled persons from access to covered entities that use the internet and mobile applications as a means of reaching the public would defeat the purpose of this important civil rights legislation. Today, places of public accommodation are increasingly using mobile applications ("mobile apps") to provide services, benefits and goods more effectively to the public and expand the services the public accommodation has to offer in new ways. These services that are provided via a public accommodation for web applications, mobile application, and hybrid applications ("mobile platform") also need to be

provided to disabled individuals.

107. ADA Title III states that discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated by DOJ implementing Title III require public accommodations to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Auxiliary aids and services include . . . *accessible electronic and information technology*, among other methods.  28 C.F.R. § 36.303(b). Auxiliary aids and services include acquisition or modification of equipment or devices, and other similar services and actions. 28 C.F.R. 36.303(b)(3)-(4).

108. The plain language of these statutory provisions applies to discrimination in offering the goods and services ''of'' a place of public accommodation or the services, programs, and activities ''of'' a public entity, rather than being limited to those goods and services provided ''at'' or ''in'' a place of public accommodation or facility of a public entity.

**109.** The ADA and the Title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services. A commercial transaction between a customer and a public accommodation requires communication between the two. The Defendants have chosen to provide a service through a mobile application to promotions, dining options, free online slots, casino features, access to Marquee Rewards, among many other services through the mobile platform. The Defendants communicate all of that to able-bodied individuals as a service. Yet, the Defendants' use of their mobile application and the services they offer through the application does *not* communicate and provide services to the disabled individuals. This is contrary to the broad mandate of the ADA which prohibits not only outright exclusion but also unnecessary differential treatment. See 42 U.S.C. §§ 12182(a), (b)(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "…*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]" and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities*." *See* H.R. Rep. No. 485, pt. 2, at 108 (1990).

110. The unlawful implementation of eligibility criteria in other contexts that are clearly covered by the Act is analogous to the Defendants' effective screening of Plaintiff from using its mobile app. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. See Section 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if the Defendants screened guests as they entered, sending home guests on the grounds that they were deaf or physically disabled or suffered from diabetes or any other disability. See 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("*It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater.*"). ("*An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store'. Accordingly, the site of the sale is irrelevant. All that matters is whether the good or service is offered to the public.* (*Nat'l Fed'n of the Blind. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015). The Defendants' failure to permit or include assistive technology in relation to their mobile app directly and physically screens and prevents the Plaintiffs from being able to use the mobile app, just as if the Defendants in their establishment placed items outside

the Plaintiffs' reach and said Plaintiffs cannot have the items unless the Plaintiffs can get the items for themselves.

111. In our contemporary technological society, "excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." *Netflix,* 869 F.Supp.2d at 200 (quoting *Carparts,* 37 F.3d at 20). (quoting *Nat'l Fed'n of the Blind. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015).

112. The Defendants diminish the Plaintiffs' rights under the ADA to fully participate in all aspects of society, which is counter to Congress' goal. The Defendants' ableism, as described throughout the Complaint, is excluding the Plaintiffs from equality of opportunity, full participation, independent living, and economic self-sufficiency and in doing so excludes the Plaintiffs from a plethora of goods and services that are offered through the mobile platform which includes but is not limited to the following:

(a) The Defendants are excluding, denying services, and otherwise segregating the Plaintiffs from all of the benefits and services the Defendants offer through their mobile apps as a result of their failure to modify their mobile application platform to allow assistive technology, which includes, but is

not limited to, voice recognition, alternative input methods, assistive touch functions, among other accessibility methods that the Plaintiffs require, to compete on an equal basis and maintain independent self-sufficiency;

(b) The Defendants are excluding, denying services, or otherwise segregating the Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from the Defendants' services that enables individuals to view promotions through the mobile apps;

(c) The Defendants are excluding, denying services, or otherwise segregating the Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from the Defendants' services that enables individuals to view the various dining options at Long John Silver's through the mobile apps;

(d) The Defendants are excluding, denying services, or otherwise segregating Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from the Defendants' services that enables individuals to view the various casino features and options at Long John Silver's through the mobile apps;

(e) The Defendants are excluding, denying services, or otherwise segregating the Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from Defendants' services that enables individuals to play online slots through the mobile apps;

**(f)** The Defendants are excluding, denying services, or otherwise segregating the Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from the Defendants' services that enables individuals to view and access coupons, the menu and restaurant locations through the mobile apps;

**(g)** The Defendants are excluding, denying services, or otherwise segregating the Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from the Defendants' services that enables individuals to access and view all the benefits of Long John Silver's through use of the mobile apps;

**(h)** The Defendants are excluding, denying services, and otherwise segregating the Plaintiffs as a result of their failure to modify equipment, devices and/or other similar services. 28 *C.F.R.* § 36.303(b)(3)-(4).

**(i)** The Defendants are excluding, denying services, or otherwise segregating the Plaintiffs of all the goods and services offered on its mobile apps as a result of the Defendants' failure to design their mobile apps that enable alternative assistive technology;

113. The design of the Defendants' mobile app impedes the Plaintiffs and others similarly situated from accessing the services, privileges and accommodations afforded patrons through the mobile app. The mobile

app fails to integrate alternative access methods that allow a person with limited manual dexterity in their hands to access the information and navigate the mobile app.

114. The actions by the Defendants violate:

a) 42 U.S.C. § 12182(a), because the Defendants' actions deny the Plaintiffs full and equal enjoyment of the Defendants' goods and services;

b) 42 U.S.C. § 12182(b)(1)(A)(i), because the Defendants' actions deny the Plaintiffs equal participation in goods and services offered by the Defendants;

c) 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because the Plaintiffs are provided both separate and unequal benefits of the Defendants' goods and services;

d) 42 U.S.C. § 12182(b)(1)(B), because the Defendants do not provide their goods and services in the most integrated setting appropriate;

e) 28 C.F.R. 36.303(c), because the Defendants have failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiffs.

115. The Plaintiffs do not allege that there are specific mandatory regulations

for mobile applications that establish compliance or non-compliance as a matter of law. The Plaintiffs plead, consistent with the Department of Justice determinations, that in achieving such conformance and usability of mobile apps by individuals with disabilities, the Defendants should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.1 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

116. To date, the Defendants' discriminating actions continue.

117. As pled above Long John Silver's, LLC., "owns" and "operates" the Long John Silver's mobile application and its goods and services offered on the mobile app, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

118. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their

reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

119. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by the Defendants.

**WHEREFORE**, premises considered, Kristina King and King King demand judgment against the Defendants on Counts One through Six and requests the following injunctive and declaratory relief:

1. That the Court declare that the property owned and operated by the Defendants as well as all Defendants' illegal actions described herein violate the Americans with Disabilities Act, as more particularly described above;

2. That the Court enter an order enjoining the Defendants to alter the facility to make it accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and its implementing regulations, as stated in Count One;

3. That the Court enter an order, in accordance with Count Two, directing the Defendants to modify their policies, practices, and procedures both to remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin the

Defendants to make their business practices consistent with ADA Title III in the future;

4.  That the Court enter an order directing the Defendants to provide the Plaintiffs full and equal access to Long John Silver's and to the use of the Long John Silver's facility, and further order the Defendants to maintain the required accessible features at the establishment so that the Plaintiffs and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

5.  That the Court enter an Order directing the Defendants to evaluate and neutralize their policies, practices, and procedures towards persons with disabilities for such reasonable time to allow Defendants to undertake and complete corrective procedures;

6.  That the Court enjoin the Defendants to remediate Long John Silver's to the proper level of accessibility required for the design and construction of the facility for first occupancy, as stated in Count Four;

7.  That the Court enter an order requiring that Defendants adopt and implement a website accessibility policy and take the necessary actions to make their website accessible to the Plaintiffs, as particularly described in Count Five;

8. That the Court enter an order requiring the Defendants to place on their homepage a statement concerning its website accessibility policy; provide training to all their workers and associates who write or develop programs or code; and test their website quarterly to identify and repair any incidence of nonconformance;

9. That the Court enter an order requiring the Defendants to adopt and implement a mobile application accessibility policy and take the necessary actions to make their mobile application accessible to the Plaintiff, as particularly described in Count Six;

10. That the Court enter an order requiring the Defendants to place on their mobile application a statement covering their mobile application accessibility policy; provide training to all their workers and associates who write or develop the programs and code for the mobile application; and test the mobile application quarterly to identify and repair any indication of non-conformance;

11. That the Court award reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to the Plaintiffs;

12. That the Court award minimum presumptive damages of $300 per each violation as provided for under Tex. Hum. Res. Code § 121.004(b); *Diaz v. Doneraki Restaurants, Inc.*, No. H-12-2238, 2014 WL 2332822

(S.D. Tex. May 29, 2014); *Burrell v. Akinola*, No. 3:15-CV-3568-B, 2016 WL 3523781, (N.D. Tex. Jun. 27, 20216); and

**13.**  That the Court award such other, further, and different relief as it deems necessary, just, and proper.

Respectfully Submitted, this 21ST Day of March 2019.

<u>*/s/ Amanda L. Powell*</u>
**AMANDA L. POWELL**
**Texas Bar No. 24081104**
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
ALP@ADA-Firm.com
*Attorney for the Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed with the Clerk of Court the aforementioned Complaint for service of process by USPS mail or electronic mail, postage prepaid and properly addressed this 21ST day of March 2019 to the following:

**BNC Food Group, LLC**
Attn.: Registered Agent
912 E. 55th Street
Austin, TX 78751

**Long John Silver's, LLC**
**c/o C T Corporation System**
Attn.: Registered Agent
1999 Bryan St., STE 900
Dallas, TX 75201

*/s/ Amanda L. Powell*
**AMANDA L. POWELL**
**Texas Bar No. 24081104**
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
ALP@ADA-Firm.com
*Attorney for the Plaintiffs*